RMR:PT
F#2009R00232

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M-09-408

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

ROBERT KNOWLES,

Defendant.

- - - - - - - - - - - - - - - - - -X

**UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT

(T. 18, U.S.C., § 1343)

EASTERN DISTRICT OF NEW YORK, SS.:

EDWARD CHOO, being duly sworn, deposes and says that he is a Supervisory Investigator with the Office of the Inspector General, Port Authority of New York and New Jersey ("PA-IG"), duly appointed according to law and acting as such.

Upon information and belief, from in or about and between December 2007 and July 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ROBERT KNOWLES, together with others, did knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises and, for the purpose of executing the scheme and artifice, and attempting to do so, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: interstate

facsimiles of requests that another person produce falsified reports of concrete break test results,[1] and interstate facsimiles of falsified reports of concrete break test results, which reports falsely stated that concrete work on United States Post Offices had met contractual standards for strength.

(Title 18, United States Code, Section 1343)

The source of your deponent's information and the grounds for his belief are as follows:[2]

I. Introduction

1. I have been a Supervisory Investigator for the PA-IG since 2001. Investigators for the PA-IG, including myself, are cross-designated as deputy U.S. Marshals by the United States Marshals Service. The work of the PA-IG includes investigating fraud perpetrated with respect to construction projects performed for the Port Authority of New York and New Jersey ("Port Authority") and referring such frauds to federal authorities for prosecution. Prior to joining the PA-IG, I worked for 23 years in federal law enforcement, including 5 years as a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF") and 18

---

[1] The term "concrete break tests" will be defined in paragraph 4, below.

[2] Because the purpose of this affidavit is limited to setting forth probable cause to believe that the defendant committed the charged crime, I have set forth only those facts necessary to establish probable cause to arrest, and have not mentioned each and every fact of which I am aware.

years as a Special Agent with the United States Customs Service ("U.S. Customs"), from which I retired in 2001 as a Supervisory Special Agent. During my 23 years as a federal agent at ATF and U.S. Customs, I participated in an undercover capacity in numerous investigations and supervised many other agents who themselves acted in an undercover capacity. The facts set forth herein are based on my personal observations, including information I obtained in an undercover capacity; information from confidential sources and witnesses; my discussions with other law enforcement officers; my review of documents and other evidence, including consensual recordings; and my experience and background as a criminal investigator.

2. In the course of my work for the PA-IG, I have learned that general contractors are often contractually required by their clients to have a certified testing company certify in writing that the concrete installed by the general contractor has been inspected, tested against industry standards, and found to meet the qualifications for concrete strength specified by the client in the contract. As detailed below, the defendant ROBERT KNOWLES was employed by Omega Service Maintenance Corp. ("Omega"), a general contractor with its headquarters located at 11 Evergreen Avenue in Neptune City, New Jersey. Omega hired a concrete testing company to test concrete that Omega had installed at various federal facilities. As established herein,

KNOWLES induced this testing company to falsify the test results regarding this concrete. Specifically, KNOWLES instructed the tester to falsely certify that concrete tests showed the concrete installed by Omega to be of a particular strength, when in fact the tests showed that the concrete in question was of a considerably lower strength.

II. Assistance of the Cooperating Witness

3. In August 2006 I led a team of agents who arrested an individual (the "CW") who ran a business performing tests on various aspects of construction projects, including concrete strength. The CW was arrested for submitting false welding reports, and upon his/her arrest, the CW agreed to plead guilty to federal charges and cooperate with law enforcement. As part of that cooperation, the CW made consensual recordings, on the phone and in person, of various people for whom he/she worked, such as building contractors and testing company employees. The CW also introduced me, in an undercover capacity, to these people, and while posing as a co-worker of the CW, I similarly made consensual recordings of my interactions with them.

4. One of the types of tests performed by the CW in the course of his/her testing business is called a "concrete break test." A concrete break test measures the strength of installed concrete by testing the amount of pressure, measured in pounds per square inch ("PSI"), that the concrete in question can

withstand before breaking. In order to perform these tests, three samples of the concrete in question are taken in cylinder form from the worksite, using a method prescribed by the American Society for Testing and Materials ("ASTM"). These cylinder samples are tested in a laboratory 7 days, 28 days, and sometimes 56 days after the concrete was poured. The reason for testing samples of the same concrete pour over time is that concrete does not achieve its full strength until some weeks after it is poured, and as such, the 28-day pour sample is often the sole sample used to determine if installed concrete is of the contractually required strength. However, because a sample taken on the 7th day after pouring can indicate what the ultimate strength of the concrete will be, the 7-day results allow the contractor to more quickly replace or repair concrete which appears unlikely to meet the required standard.

III. Work Performed By the CW for Omega

5. One company for which the CW performed testing work was Omega. Omega was and is in the business of serving as a general contractor on construction projects, many of which include the installation of concrete. Under the terms of its contracts with its clients, Omega is often responsible for having concrete break tests done on work that Omega performs, and the successful completion of such tests is often a precondition to Omega's receiving payments under its contracts. Omega has

performed substantial amounts of construction work for United States government agencies, including but not limited to the United States Postal Service ("USPS").

IV. Request to Falsify Concrete Test Results

6. One of Omega's contracts with the USPS called for Omega to install a concrete sidewalk at a United States Post Office located at 90 Vermilyea Avenue in the Inwood section of Manhattan (the "Inwood Post Office project"). Omega hired the CW to test samples of the concrete poured at this site, to show the USPS that the concrete installed by Omega complied with a 4,000 PSI standard 28 days (or more) after the pour, as required by the contract. In late 2007, the CW tested a sample of the concrete installed at the Inwood Post Office project, finding that the sample broke at approximately 2,600 PSI at an age of 7 days.

7. On December 18, 2007, the CW and I went to Omega's offices while wearing hidden recording devices and met the defendant ROBERT KNOWLES, a project manager at Omega. KNOWLES asked us if we had his "4,000," meaning a report showing that the concrete Omega installed at the Inwood Post Office project passed a concrete strength test of 4,000 PSI. The CW said no, because he/she had not performed the tests yet on samples 28 days or older, and the CW further stated that he/she had come to Omega's offices to get the sample concrete cylinders upon which he/she would perform this 28-day break test. KNOWLES expressed

displeasure with our coming to get the cylinders and said, in sum and substance, that the concrete cylinders he was now giving to the CW, so the CW could perform the 28-day break test on concrete installed at the Inwood Post Office project, looked like the cylinders KNOWLES had given to the CW before, when the CW performed the 7-day break tests for the concrete installed at the Inwood Post Office project. The CW replied that the cylinders were not the same, and added that the cylinders which the CW had already tested at an age of 7 days broke at 2,600 PSI. KNOWLES acknowledged that the cylinders Omega had provided for the 7-day test broke at 2,600 PSI. KNOWLES then instructed the CW to pass these 28-day old cylinders at 4,000 PSI, regardless of what the test actually showed, and then changed his mind and instructed the CW to pass them at 5,000 PSI.

8. After leaving Omega's offices on December 18, 2007, I immediately took the two concrete cylinders that the defendant ROBERT KNOWLES had just given the CW and brought them to the Port Authority concrete testing laboratory in Jersey City, New Jersey. The break tests performed by Port Authority testing staff on these sample cylinders showed that the concrete cylinders which KNOWLES had given to the CW earlier that day broke at 4,080 PSI. Upon receiving these results, I placed a recorded telephone call to KNOWLES later in the day on December 18, 2007.

9. During this telephone call of December 18, 2007, I told the defendant ROBERT KNOWLES that the concrete he had given us tested at 4,085 PSI. I asked KNOWLES what he wanted us to put on the paperwork, and then asked "You want us to put what it is?" KNOWLES replied, in sum and substance, that he wanted everything to pass at 5,000 PSI, but for the 28-day test I had just performed, KNOWLES stated that he wanted the report to indicate that the concrete broke at 4,085 PSI, "so that way I don't look perfect." KNOWLES also asked that on the report I list the age of the concrete I had just tested as 7 days, even though I had just tested it for the purpose of satisfying the 28-day test. Additionally, KNOWLES confirmed that he wanted the two concrete cylinders which the CW had previously tested to be reported as having broken at 5,000 PSI at an age of 28 days, even though the CW had told KNOWLES that these samples had broken at less than 2,600 PSI at an age of 7 days.[3] Thus, in sum, KNOWLES directed me to falsely state that concrete from the Inwood Post Office project broke at 4,085 PSI at 7 days and at 5,000 PSI at 28 days,

---

[3] From my experience investigating the construction industry, I believe that KNOWLES wanted the 7-day test falsified, even though the results of the 7-day test were not relevant to whether Omega satisfied its contract with the USPS, in order to make Omega's work appear to be of higher quality than it actually was, and thus to convince the USPS to hire Omega to do future work. I further believe that KNOWLES wanted the later test falsified, even though this test met the 4,000 PSI standard set forth in Omega's contract with the USPS, for the same reason.

notwithstanding the fact that the actual results for each of those tests were considerably lower.

10. At the direction of law enforcement and in response to the defendant ROBERT KNOWLES'S request, the CW provided KNOWLES with a test report falsely stating that the concrete samples from the Inwood Post Office project had a 7-day strength of 4,080 PSI, and that two 28-day-old samples had strengths of 5,150 and 5,130 PSI. Omega submitted this falsified report to the A&E firm overseeing the Inwood Post Office project on behalf of the USPS. In reliance on this falsified report, the A&E firm instructed the USPS to pay Omega for its concrete work on the Inwood Post Office project. From in or about December 2007 through in or about January 2008, the USPS paid Omega a total of $59,806 for its concrete work on the Inwood Post Office project.

11. At some point after December 2007, as part of law enforcement's investigation of Omega, the USPS told the defendant ROBERT KNOWLES that it was conducting an audit of Omega's work for the USPS. On July 11, 2008, in response to a request from the USPS, which request the USPS described to KNOWLES as being made pursuant to the audit, KNOWLES faxed, from Omega's New Jersey offices to a USPS facility in the Eastern District of New York, a copy of the falsified report for the concrete installed at the Inwood Post Office project.

WHEREFORE, I respectfully request that an arrest warrant be issued for the defendant ROBERT KNOWLES so that he may be dealt with according to law.

WHEREFORE, I further respectfully request that this affidavit be and remain sealed until further order of the Court.

Edward J Choo

EDWARD CHOO
Supervisory Investigator
Office of the Inspector General
Port Authority of New York and New Jersey

Sworn to before me this
27th day of April, 2009

UDGE
RK